CROSSETT TIMBER & DEVELOPMENT COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 62294, 67775.   Promulgated January 10, 1934.

*Donald Browne, C.P.A.*, for the petitioner.
*Frank B. Schlosser, Esq.*, for the respondent.

ARUNDELL: The respondent has determined deficiencies in income tax for the fiscal years ended November 30, 1929 and 1930, in the respective amounts of $4,040.36 and $2,230.24. Only a portion of the deficiency for each year is in controversy. All of the issues relate to sums received or paid out by petitioner in connection with gas-producing properties which it owned and which were leased to others. The proceedings were consolidated, and the facts stipulated.

The first issue is whether petitioner is entitled to a depletion deduction in respect of an amount of $20,173.57 received in 1929 under the circumstances herein set forth. Petitioner in 1923 acquired lands in Louisiana theretofore owned by another corporation and on which the predecessor corporation had granted oil and gas leases in 1921. The separate identities of petitioner and its predecessor are immaterial and we will speak of them indiscriminately as petitioner or lessor; likewise the original and successor lessees will be termed, without distinction, as the lessee.

In connection with the original lease of the lands in 1921 an operating agreement was entered into between the lessor and the lessee under which the lessor was entitled to certain oil royalties and a gas royalty of one cent per thousand cubic feet of gas taken and marketed from wells drilled prior to January 1, 1928, with an increase of one fourth of one cent each five-year period thereafter. In the eighth article of the operating agreement it was provided " that of all gas sold, used or furnished by " the lessee " one-third will be drawn from lands owned by " the lessor. No oil wells have been brought in on the property covered by the agreement, but gas wells have been brought in and the petitioner received in the years 1924 to 1928, inclusive, the royalties agreed upon for all gas withdrawn from wells drilled on its lands. In 1929 a dispute arose as to whether the lessee had complied with the provisions of the eighth article of the operating agreement during the years 1926, 1927, and 1928. The petitioner contended that, because of more intensive drilling by the lessee on its own lands adjacent to those of the petitioner, less than one third of the total gas marketed had been produced from petitioner's properties, in violation of the terms of the operating agreement. The controversy was not carried to the courts, but was settled by the payment to the petitioner by the lessee on September 12, 1929, of $20,173.57. This amount was computed by taking one third of the total production from all wells controlled by the lessee both on its own lands and those of the petitioner and multiplying by the royalty rate due the petitioner under the agreement. From the sum thus attained, a deduction was made for royalties paid to the petitioner during the years 1926, 1927, and 1928. The respondent has included the sum of $20,173.57 in the taxable income of petitioner for the

taxable year 1929, but has allowed no deduction for depletion with respect to this amount.

Petitioner claims it is entitled to a depletion deduction of 27½ percent of the amount of $20,173.47 received in 1929. The respondent's position is that the money so received was not a royalty payment, but damages for breach of contract, and not subject to a depletion deduction. The depletion deduction permitted by the statute applies to "income from the property", section 114 (b) (3), Revenue Act of 1928, and may be taken in respect of both royalties and bonuses. *Murphy Oil Co.* v. *Burnet*, 287 U.S. 299. Clearly the sum here involved was not a payment of royalties. In the words of the stipulation filed, "the petitioner received in the years 1924 to 1928, inclusive, the royalties specified * * * for all gas withdrawn from wells drilled on its lands." Nor, in our opinion, was it a bonus. A bonus is consideration paid by the lessee "for the right which he acquires to enter upon and use the land for the purpose of exploiting it." It is "consideration for the lease." *Burnet* v. *Harmel*, 287 U.S. 103. See *Lizzie H. Glide*, 27 B.T.A. 1264. Here the lessee had acquired the lease and operating agreement several years before, and it is to be assumed that any bonus required had been paid. At least the payment made in 1929 was neither demanded nor received as a bonus or any other consideration for the lease. It was demanded and paid, not for the right to enter upon and drill the lands, but as a penalty for failure to do so; it was not income from the property, nor "income derived from the extraction of the oil" or gas from the property (*Palmer* v. *Bender*, 287 U.S. 551), but was in the nature of damages for the lessee's breach of contract in failing to exploit the property. The taxing statute makes no provision for the deduction in such cases of allowances for depletion, and we sustain the respondent's refusal to permit a deduction.

The next two issues may be considered together, having to do with petitioner's portion of the cost of drilling wells on what may be termed a 50-50 basis. The operating agreement between lessor and lessee provided that the lessee should notify the lessor where it proposed to drill, whereupon the lessor could elect to participate in the drilling. Upon election made by the lessor to participate as to any well it was to "be drilled at the joint expense" of the lessor and lessee, the lessor to "advance one-half of the cost of drilling as the work progresses." It was further provided in the same (the fifth) article of the agreement that:

If the grantor gives notice of its election to participate and the well is brought in as a gas well, then, and in that event, the grantor shall ipso facto relinquish all rights of ownership in said well, but the grantee shall pay to the grantor a royalty of one cent per thousand cubic feet in addition to the royalties hereinbefore specified under the same terms and conditions as herein above provided.

Under these provisions of the agreement petitioner elected to participate in the drilling of four wells which were brought in as gas wells. Two of them were drilled in 1929 and two in 1930. As to each of them petitioner paid its one half of the costs as follows:

|  | 1929 | 1930 |
|---|---|---|
| Cost of physical equipment | $5, 095. 00 | $7, 263. 35 |
| Intangible expenditures | 6, 077. 95 | 7, 842. 99 |
| Total | 11, 172. 95 | 15, 106. 34 |

Petitioner considered that it had a right of election under article 243 of Regulations 74, and deducted the above amounts in its 1929 and 1930 returns, which deductions were disallowed by the respondent. Petitioner now concedes that the cost of physical equipment, $5,095 for 1929 and $7,263.35 for 1930, was properly capitalized by respondent, but contends that the amounts are subject to depreciation. No depreciation has been allowed by the respondent. The proper rate of depreciation, if allowable, is stipulated.

As the result of petitioner's election to participate in the drilling of four wells and its payment of one half of the drilling costs, it received during 1929 and 1930 the additional royalties provided for in the operating agreement.

In order for the petitioner to prevail on the question of depreciation it must meet the burden of establishing ownership of depreciable property. *Frank Holton & Co.*, 10 B.T.A. 1317; *National Electric Ticket Register Co.*, 17 B.T.A. 42; *Leggett & Platt Spring Bed Co.* v. *Crooks*, 34 Fed. (2d) 492; *Iten Biscuit Co.*, 25 B.T.A. 870. The contract under which petitioner paid some of the drilling costs provided that as to any well in which it participated it should " ipso facto relinquish all rights of ownership in said well." This would indicate that petitioner acquired no property right in the four wells in question, and there is nothing in the record to establish any other view of the matter. True, it is stipulated that the cost of physical equipment paid by petitioner has been properly capitalized by respondent, but it does not follow that such capital costs are subject to depreciation. The respondent's view is that the cost borne by petitioner represents cost of the additional royalty of one cent per thousand cubic feet of gas to which petitioner became entitled by reason of its participation. If so, its capital outlay will be recovered through depletion deductions from the additional royalties which it appears from the stipulation have been allowed by the respondent.

The remaining portion of costs borne by petitioner in the drilling of the four wells has been allocated to what are for convenience termed " intangible drilling and development costs." T. D. 4333, C.B. XI-1, p. 31. Under the cited Treasury decision and under the Commissioner's regulations, intangible costs may, " at the option

of the taxpayer, be deducted as a development expense or charged to capital account returnable through depletion." See *W. R. Ramsey*, 26 B.T.A. 277. These provisions, in our opinion, are not applicable to one in the position of this petitioner. It was not engaged in drilling wells for itself. The lessee drilled the wells and under the contract it became the owner of them. The substance of the arrangement between petitioner and the lessee was that petitioner reimbursed the lessee for expenses incurred by the latter. The consideration for petitioner's expenditures was the increased royalty it was to receive. The sums so paid, like those allocated to physical equipment, are part of the cost of royalties and subject to recoupment through deductions for depletion which, for the taxable years, have been allowed by the respondent.

The final issue is whether the amount of $6,279.16, received by petitioner in 1930 as advance royalties under minimum royalty provisions of a contract, constitutes income.

In 1929 petitioner entered into an agreement with the lessee of its lands, modifying the operating agreement of 1921. The 1929 agreement provided for a specified minimum production of gas and concomitant minimum royalties for the twenty-year period from 1929 to 1948. In the event of shortage of production in any year the difference between the royalty on the gas produced and the minimum royalty is to be paid to petitioner on or before January 15 of the following year, and, if this occurs and in a subsequent year there is an excess over minimum requirements, the royalty payments for shortages in prior years are to be applied to the excess. If, after adequate and reasonable development, the properties will not produce the minimum requirements the lessee is to be relieved of paying advance royalties on shortages, and if at the end of the twenty-year period the properties have not produced a specified amount of gas per year—in either event—petitioner will be required to pay back to the lessee all advance royalty payments, with interest at 6 percent.

In 1929 the lessee did not produce the minimum requirements and on February 7, 1930, it paid to petitioner $6,279.16 as advance royalties on the 1929 shortage. Petitioner has retained the amount so received and recorded it on its books as a liability to the lessee. The lessee has not subsequently taken sufficient gas from petitioner's properties so that it could apply any part of the $6,279.16 as royalty on gas actually produced. The respondent has added the amount of $6,279.16 to petitioner's taxable income for the year 1930, and has allowed a depletion deduction with respect thereto of 27½ percent.

Petitioner concedes that the $6,279.16 received in 1930 constituted " advance royalty " but contends that it should not be included in income because of its liability to repay it either through application

to subsequent production in excess of minimum requirements or in cash in the event of demonstrated inability of the field to produce to minimum. *Jamison Coal & Coke Co.*, 24 B.T.A. 554; modified, 67 Fed. (2d) 342, and *Hutchinson Coal Co.*, 24 B.T.A. 973; affd., 64 Fed. (2d) 275, cited by petitioner, do not sustain its views. In those cases the taxpayers were the lessees, and the question was whether the amount paid by the lessees, representing the difference between the minimum royalties and the royalties on coal actually mined, was deductible currently as an expense or was a capital expenditure under which the lessee acquired an equity in property. As these cases now stand, one being modified and the other affirmed by the circuit court, they hold that the entire minimum royalties paid are deductible currently. The converse of these holdings would require that sums so paid and treated as royalties by the lessee should be included in income of the lessor. *Bankers Pocahontas Coal Co.*, 18 B.T.A. 901; affd., 55 Fed. (2d) 626, and 287 U.S. 308, and *Louis Werner Saw Mill Co.*, 26 B.T.A. 141, expressly hold that minimum royalties are taxable income to the lessor. The only difference between these latter cases and the one before us is the provision here under which the petitioner may eventually be required to repay a part of the royalties received. The conditions, however, which might require repayment were conditions subsequent and did not prevent petitioner's unfettered use of the money in the year of receipt. In *Brooklyn Union Gas Co.*, 22 B.T.A. 507; affd., 62 Fed. (2d) 505, litigation arose under which the taxpayer was required by court order to impound a portion of the moneys received. On the question of the year in which such moneys represented taxable income it was held that they were income in the year when earned and not in the year when the litigation was finally terminated. The principle of that case is applicable here. The contingent liability which might at some future time require repayment of some indeterminate portion of the royalties imposed no restriction upon petitioner's use of the money currently as received. See also *Consolidated Asphalt Co.*, 1 B.T.A. 79; *Uvalde Co.*, 1 B.T.A. 932.

All issues are decided for the respondent.

*Decision will be entered for the respondent.*